**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF CALIFORNIA**

MICHAEL L. SMITH,

Plaintiff,

v.

JORDAN RAMIS PC, and DOUGLAS P. CUSHING,

Defendants

CASE NO: 12-CV-2025 W (RBB)

**ORDER GRANTING DEFENDANTS' SUMMARY-JUDGMENT MOTION [DOC. 24]**

Plaintiff Michael L. Smith is suing Defendants Douglas P. Cushing and Jordan Ramis PC for legal malpractice and fraud in connection with the preparation of a domestic-partnership agreement. Defendants have filed a motion for summary judgment or, alternatively, partial summary judgment. Plaintiff Smith opposes.

The Court decides the matters on the papers submitted and without oral argument. See Civ. L. R. 7.1(d.1). Because the undisputed facts establish that the case was filed after the statute of limitations expired, and Defendants did not misrepresent their qualifications nor did Plaintiff rely on any alleged misrepresentations, the Court will grant Defendants' summary-judgment motion [Doc. 24].

## I. BACKGROUND

Plaintiff Michael L. Smith is an architect and entrepreneur. Defendant Douglas P. Cushing is an attorney with Defendant Jordan Ramis PC. Attorney Cushing practices in Portland, Oregon.

Beginning in approximately 2001, Smith retained Cushing and Jordan Ramis PC, then known as Jordan Schrader, to perform estate-planning work. (*Smith Dep.*, 23:14–18, 25:2–8.[1]) Thereafter, from time to time, Smith would retain Cushing to perform various transactional work.

In 2006, Smith and his partner, Christopher Wixom, decided to purchase a house together and move to San Diego, California. Smith asked Cushing if he could prepare a domestic partnership agreement ("DPA") and promissory note. (*Smith Dep.*, 30:7–15.) Cushing "said they could do that." (*Id.*, 30:20–24.) Cushing felt he could prepare the agreement because he had experience in preparing "prenup type agreements and had done one domestic partnership agreement," and "had access . . . to California statutes." (*Cushing Dep.*, 51:6–10.[2]) He also viewed the preparation of the agreement as part of Smith's estate planning. (*Id.*, 11–29.)

Although Cushing was retained to prepare the DPA, Smith and Wixom "negotiated all the terms of the agreement, and... essentially gave them to" Cushing. (*Smith's Underlying Dep.*, 86:24–25.[3]) The final version of the agreement was executed

---

[1] Portions of Michael Smith's deposition taken in this case ("Smith Dep.") are attached to Defendants' Exhibit Index [Doc. 24-5] as Exhibit D [Doc. 24-6], and to Plaintiff's Exhibit List [Doc. 26-3] as Exhibit 1 [Doc. 26-4].

Page references to deposition transcript cited in this order are to the transcript's actual page, not the exhibit-page number.

[2] Portions of Douglas P. Cushing's deposition ("Cushing Dep.") are attached to Defendants' Exhibit Index as Exhibit F [Doc. 24-7], and to Plaintiff's Exhibit List as Exhibit 2 [Doc. 26-5].

[3] Portions of Micahel L. Smith's deposition in the underlying dissolution proceeding ("Smith Underlying Dep.") are attached to Defendants' Exhibit Index as Exhibit E [Doc. 24-6].

on September 20, 2006. (*See Def.s' Ex. 15* [Doc. 24-8]; *Pl's Resp. Sep. State.* [Doc. 26-1], No. 10.)

In 2009, Smith and Cushing separated (*Smith Dep.*, 28:11), and Smith moved back to Washington. In January 2010, Smith spoke with Cushing about what Smith could claim as "combined living expenses" under the DPA. (*Cushing Dep.*, 136:7–137:21; *Pl.'s Resp. Sep. State.* [Doc. 26-1], No. 15.) Smith also asked Cushing to revise his will to remove Wixom. Cushing revised the will and sent the document to Smith, but Cushing did not hear back from him. (*Cushing Dep.*, 171:25–172:1; *Pl's Resp. Sep. State.*, No. 16.) Meanwhile, Smith retained attorney Eugene Bruno and filed for dissolution of the domestic partnership on June 23, 2010. (*Smith Dep.*, 28:11–20; *Bruno Dep.*, 20:15–17[4]; *Def.s' Ex.* C [Doc. 24-6]; *Pl's Resp. Sep. State.*, No. 14.)

By mid 2010, Wixom began claiming the DPA was vague, and in approximately April or May of 2010, Bruno advised Smith that the DPA was vague. (*Smith Dep.*, 98:10–16; *Bruno Dep.*, 78:10–24; *Pl's Resp. Sep State.*, No.17.) As a result, Smith became unhappy with the quality of Cushing's legal work on the DPA. (*Smith Dep.*, 101:15–24.)

On August 20, 2010, Smith sent Cushing an email refusing to pay the law firm's billing statement and stating that the firm's "vague and badly written" DPA had caused him to incur additional legal fees:

> I received another statement from your firm for services in July regarding the Domestic partnership (invoice 66168). Per our last conversation, I will not pay this invoice. I have been severely compromised because of the incompetence of whoever drafted my Domestic partnership. I suggested you talk to my California attorney, Eugene Bruno, to learn more about the lack of understanding of California law and how vague and badly the document was written. As a result, it is costing me additional legal fees in California and may end up in litigation which as you know, will be extremely costly.

---

[4] Portions of Eugene Bruno's deposition ("Bruno Dep.") are attached to Defendants' Exhibit Index as Exhibit G [Doc. 24-7], and to Plaintiff's Exhibit List as Exhibit 5 [Doc. 26-8].

> I hope you can get to the bottom of why your firm allowed such a poorly written document to be created. I hope whatever you learn can help prevent this from happening to someone else.

(*Defs.' Ex. 21* [Doc. 24-9]; *Pl.'s Resp. Sep. State.*, No. 18.) After receiving the email, Cushing considered himself and the Jordan Ramis firm fired by Smith. (*Cushing Dep.*, 172:12–18, 184:20–185:4.) Cushing's firm never sent Smith another bill. (*Smith Dep.*, 100:18–101:14.)

In February 2011, Wixom filed a motion to declare the DPA invalid. (*Def.s' Ex. J* [Doc. 24-7]; *Pl's Resp. Sep. State.*, No. 20.) In March, Smith contacted Cushing to arrange for him to talk to Bruno and provide Bruno his notes. (*Smith Dep.*, 24:14–24, 95:23–96:17.) On March 31, 2011, Bruno sent a follow-up email to Cushing, requesting that Cushing call him regarding the DPA and promissory notes. (*Cushing Dep.*, 180:19–181:7.) During their subsequent telephone conversation, Bruno requested Cushing's file regarding the DPA, which Cushing sent. (*Cushing Dep.*, 181:17–20; *Bruno Dep.*, 33:14–25, 34:16–22.) Aside from agreeing to send the file, Bruno testified that Cushing could not recall much about the DPA. (*Bruno Dep.*, 34:4–7.)

Bruno contends that he next talked to Cushing in approximately September 2011, in preparation for trial in the dissolution proceeding. (*Bruno Dep.*, 35:13–36:4.) During that conversation, Bruno alleges he told Cushing about the grounds Wixom was using to attack the DPA, and Bruno and Cushing "discussed any sort of help that [Cushing] could provide in terms of testimony." (*Id.*, 36:2–10.) However, Cushing did not "have a very good recollection of the events surrounding the creation of the" DPA. (*Id.*, 37:1–4.) Ultimately, Bruno decided not to call Cushing as a witness. (*Id.*, 36:11–14, 58:21–23.)

In October 2011, the family-law court in the dissolution proceeding found the DPA invalid. On approximately November 22, 2011, Bruno called Cushing and notified him that the DPA had been set aside, and that Cushing would be receiving a

demand letter for damages on behalf of Smith. (*Bruno Dep.*, 55:14–56:3; *Cushing Dep.*, 183:17–184:8.)

On June 25, 2012, Smith filed this legal-malpractice lawsuit in the San Diego Superior Court. (*Def.s' Ex. B* [Doc. 24-6], at p. 19.) On August 16, 2012, Cushing removed the case to this Court. Cushing now seeks summary judgment or, in the alternative, summary adjudication based on two issues. First, Cushing argues Smith's legal-malpractice claims are barred by the 1-year statute of limitations. Second, Cushing argues the misrepresentation claims lack merit because there were no misrepresentations and Smith did not rely on any alleged misrepresentations.

## II. STANDARD

Summary judgment is appropriate under Rule 56(c) where the moving party demonstrates the absence of a genuine issue of material fact and entitlement to judgment as a matter of law. See Fed. R. Civ. P. 56(c); Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). A fact is material when, under the governing substantive law, it could affect the outcome of the case. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); Freeman v. Arpaio, 125 F.3d 732, 735 (9th Cir. 1997). A dispute about a material fact is genuine if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson, 477 U.S. at 248.

A party seeking summary judgment always bears the initial burden of establishing the absence of a genuine issue of material fact. Celotex, 477 U.S. at 323. The moving party can satisfy this burden in two ways: (1) by presenting evidence that negates an essential element of the nonmoving party's case; or (2) by demonstrating that the nonmoving party failed to make a showing sufficient to establish an element essential to that party's case on which that party will bear the burden of proof at trial. Id. at 322-23. "Disputes over irrelevant or unnecessary facts will not preclude a grant of summary judgment." T.W. Elec. Serv., Inc. v. Pacific Elec. Contractors Ass'n, 809 F.2d 626, 630 (9th Cir. 1987).

"The district court may limit its review to the documents submitted for the purpose of summary judgment and those parts of the record specifically referenced therein." Carmen v. San Francisco Unified Sch. Dist., 237 F.3d 1026, 1030 (9th Cir. 2001). Therefore, the court is not obligated "to scour the record in search of a genuine issue of triable fact." Keenan v. Allen, 91 F.3d 1275, 1279 (9th Cir. 1996) (citing Richards v. Combined Ins. Co., 55 F.3d 247, 251 (7th Cir. 1995)).

If the moving party meets its initial burden, the nonmoving party cannot defeat summary judgment merely by demonstrating "that there is some metaphysical doubt as to the material facts." Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986); Triton Energy Corp. v. Square D Co., 68 F.3d 1216, 1221 (9th Cir. 1995) (citing Anderson, 477 U.S. at 252) ("The mere existence of a scintilla of evidence in support of the nonmoving party's position is not sufficient."). Rather, the nonmoving party must "go beyond the pleadings and by her own affidavits, or by 'the depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" Celotex, 477 U.S. at 324 (quoting Fed.R.Civ.P. 56(e)).

When making this determination, the court must view all inferences drawn from the underlying facts in the light most favorable to the nonmoving party. See Matsushita, 475 U.S. at 587. "Credibility determinations, the weighing of evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge, [when] he [or she] is ruling on a motion for summary judgment." Anderson, 477 U.S. at 255.

## III. DISCUSSION

### A. Statute of limitations.

Under California law, a legal-malpractice claim must be filed within one year after the plaintiff "discovers, or through the use of reasonable diligence should have discovered, the facts constituting the wrongful act or omission, or four years from the

date of the wrongful act or omission, whichever occurs first." Cal. Code Civ. Pr. § 340.6. The limitations period is tolled if the "plaintiff has not sustained actual injury" or the "attorney continues to represent the plaintiff regarding the specific subject matter in which the alleged wrongful act or omission occurred." Id.

Here, Defendants argue that Smith's legal-malpractice claim accrued more than a year before this lawsuit was filed and, therefore, the claim is time barred. Smith counters that the claim was tolled because he did not sustain actual injury until the family-law court found the DPA invalid in October 2011. Smith also argues the claim was tolled because Cushing continued to represent him in the dissolution proceeding.

The undisputed evidence establishes that by mid 2010, Wixom began alleging that the DPA was vague, and by May 2010, Bruno advised Smith that the DPA was vague. (*Smith Dep.*, 98:10-16; *Bruno Dep.*, 78:10-24; *Pl's Resp. Sep State.*, No.17.) Also undisputed is that in August 2010, Smith sent Cushing the email accusing him of preparing a "vague and badly" written DPA. *(Defs.' Ex. 21.)* These facts establish Smith's notice of the alleged malpractice in 2010. Because this lawsuit was not filed until June 25, 2012 (*see Def.s' Ex. B*, at p. 19), Smith's malpractice claim is time barred unless one of section 340.6's tolling provisions apply. For the following reasons, the Court finds neither tolling provision applies and thus summary adjudication of Smith's legal-malpractice claims is appropriate.

**1. Actual Injury**

Defendants argue that Smith sustained actual injury in 2010, when Wixom challenged Smith's rights under the DPA, thereby forcing him to incur additional attorney's fees. (*Reply* [Doc. 27], 2:3–5.) Smith argues that he did not sustain actual injury until the DPA was ruled invalid and unenforceable in October 2011, because "[u]ntil then, there was no determination that Cushing's legal work had caused Smith to lose any right, remedy or interest." (*Opp.* [Doc. 26], 4:24–27.)

There is no bright-line rule regarding when a malpractice plaintiff has sustained actual injury. Truong v. Glasser, 181 Cal. App. 4th 102, 818 (2009). Instead, the issue depends on "the particular facts of each case in light of the alleged wrongful act or omission." Jordache Enterprises, Inc. v. Brobeck, Phleger & Harrison, 18 Cal. 4th 739, 761, fn. 9 (1998). "[W]hen malpractice results in the loss of a right, remedy, or interest, or in the imposition of a liability, there has been actual injury regardless of whether future events may affect the permanency of the injury or the amount of monetary damages eventually incurred." Foxborough v. Van Atta, 26 Cal. App. 4th 217, 227 (1994).

In Jordache, the defendant attorneys represented the plaintiff in an underlying lawsuit. During the litigation, the attorneys failed to evaluate whether the client's insurance policy provided coverage. As a result, the client's defense was not tendered to its insurance carrier, leaving the client to pay its attorneys' fees.

Later, while the underlying case was still pending, the client retained new defense counsel, who recommended the client immediately tender its defense. However, because of the delay in tendering the claim, the insurer denied coverage, requiring the client to file an insurance-coverage action seeking reimbursement for defense costs. The client also alleged millions in lost profits because the funds spent on legal fees would otherwise have been used for investments. The coverage action eventually settled, and the client filed the legal-malpractice action against the original attorneys.

In the malpractice action, the defendants moved for summary judgment based on the statute of limitations. The client opposed arguing that it did not sustain actual injury until the coverage action was settled for less than the full amount of the client's damage claim. The trial court disagreed with plaintiff's argument and found the claim was time barred. After the Court of Appeal reversed, the Supreme Court granted review to evaluate the actual-injury issue.

In reversing the Court of Appeal, the California Supreme Court explained that "[a]ctual injury refers only to the legally cognizable damage necessary to assert the

cause of action." Jordache, 18 Cal. 4th at 75. Because damages are an element of any negligence claim, the "mere breach of a professional duty, causing only nominal damages, speculative harm, or the threat of future harm-not yet realized" does not give rise to a professional negligence cause of action. Id. at 749–750 (citing Budd v. Nixen, 6 Cal. 3d 195, 200 (1971)). Nevertheless, the cause of action arises "before the client sustains all, or even the greater part, of the damages occasioned by the attorney's negligence." Id. at 750. The actual-injury inquiry is, therefore, "more qualitative than quantitative because the fact of damage, rather than the amount, is the critical factor." Id. at 752 (citations omitted). Applying these principles, the Court found that the client sustained actual injury before the coverage lawsuit settled. Specifically, the client was injured when it lost "millions of dollars–both in unpaid insurance benefits for defense costs . . . and in lost profits from the diversion of investment funds to pay these defense costs." Id. at 753. The Court also found the client sustained injury because the "attorneys' alleged neglect allowed the insurers to raise an objectively viable defense to coverage under the policies" that necessarily "reduced those claims' settlement value." Id. at 743.

In Village Nurseries v. Greenbaum, 101 Cal. App. 4th 26 (2002), plaintiff, a landscaping company, had performed work for a building contractor that filed for bankruptcy. Plaintiff retained defendant attorneys to perfect liens in order to secure payment for the landscape work. As a result of defendants' negligent advice, the bankruptcy trustee raised a viable defense to the liens, and during a hearing, the bankruptcy court expressed "serious doubts" about whether plaintiff's liens were properly perfected. Over a year later, the bankruptcy court found plaintiff's liens invalid. Id. at 34. Four months later, plaintiff filed a malpractice action.

The attorneys moved for summary judgment arguing, among other things, that the claim was time barred. Plaintiff opposed on the basis that it did not sustain actual injury until the bankruptcy court declared the liens invalid. The trial court denied the motion, and the attorneys appealed. Relying on Jordache, the Court of Appeal reversed

based on the finding that plaintiff incurred actual injury when the bankruptcy trustee questioned the validity of the liens and the judge first expressed doubt about whether the liens were perfected properly:

> Following the reasoning in *Jordache*, the settlement value of Village Nurseries' claims for payment on its liens was reduced and thus impaired at the moment the Trustee questioned the validity of the liens on August 30. The Trustee's position was asserted as a result of defendants' failure to perfect Village Nurseries' mechanic's liens on Toyon Park. Therefore, Village Nurseries sustained actual injury as a result of that act or omission no later than August 30, 1996.
>
> In light of the foregoing, we reject Village Nurseries' argument that it did not sustain actual injury until the bankruptcy court ruled that the liens were invalid in September 1997. As discussed in *Jordache*, a plaintiff need not suffer a *complete* loss of a right or reach final adjudication of an issue to sustain actual injury pursuant to Code of Civil Procedure section 340.6. [Citation omitted.]

Id., 101 Cal. App. 4th at 41–42.

Under the reasoning of Jordache and Village Nurseries, the undisputed evidence establishes that by December 2010, Smith sustained actual injury as a result of the "vague and badly" written DPA. In the August 2010 email sent to Cushing, Smith stated that as a result of "the incompetence of whoever drafted my Domestic partnership..., it is costing me additional legal fees in California...." (*Def,s' Ex. 21.*) Bruno's billing records confirm Smith was incurring legal fees in 2010 and early 2011 as a result of Cushing's alleged malpractice.

After the trial in the dissolution proceeding, Smith filed an application for "prevailing party costs." (*Id.*, Ex. 22 [Doc. 24-8] at p. 246.) Eugene Bruno's supporting declaration states that Smith "incurred a total of $59,068 in attorney's fees and costs *directly related to defending Respondent's motion for declaratory relief* and Respondent's subsequent motion for separate trial." (*Id.*, at p. 247, emphasis added.) The attached billing statements confirm that beginning in December 2010, Smith was incurring attorneys' fees "related to defending" Wixom's challenge to the DPA. (*See id.*, p. 252.) The undisputed evidence, therefore, establishes that Smith sustained actual injury by December 2010.

Moreover, there is no dispute that in February 2011, Wixom filed a motion formally challenging the DPA. (*Def.s' Ex. J.*) Similar to Jordache and Village Nurseries, by February 2011, Cushing's alleged malpractice gave rise to a viable defense, which Wixom asserted in the dissolution proceeding, necessarily diminishing the value of Smith's claims, and resulting in additional damages.

For these reasons, the Court rejects Smith's claim that actual injury did not occur until October 2011, when the DPA was found invalid, and instead finds he sustained actual injuries in December 2010 and February 2011.

**2. Continued Representation**

Defendants argue that Cushing ceased representing Smith in 2010. (*MSJ* [Doc. 24-1], 12:1–3.) Smith argues that whether Cushing ceased representing him in 2010 is a disputed issue of fact. (*Opp.*, 11:1–12:9.)

Whether continuous representation exists for purposes of the statute of limitations is viewed objectively. Laclette v. Galindo, 184 Cal. App. 4th 919, 929 (2010). "Continuity of representation ultimately depends, not on the client's subjective beliefs, but rather on evidence of an ongoing *mutual* relationship and of activities in furtherance of the relationship." Worthington v. Rusconi, 29 Cal. App. 4th 1488, 1498 (1994) (emphasis in original). Additionally, continuous representation for purposes of tolling the statute of limitations is different from "the broad standards applicable to attorney-client relationships in general, including the occasions for privileged communications." Foxborough, 26 Cal. App. 4th at 228. "The continuous representation rule... is not triggered by the mere existence of an attorney-client relationship. Instead, the statute's tolling language addresses a particular phase of such a relationship–representation regarding a specific subject matter. Moreover, the limitations period is not tolled when an attorney's subsequent role is only tangentially related to the legal representation the attorney provided to the plaintiff. [Citations.]" Id.

Here, the undisputed facts establish that by August 2010, there was no mutual relationship or ongoing activities in furtherance of Cushing's alleged representation of Smith. According to the evidence, in early 2010, Cushing revised Smith's will to remove Wixom, sent the document to Smith, and never heard back from Smith regarding the will. (*Cushing Dep.*, 171:25-172:1; *Pl's Resp. Sep. State.*, No. 16.) Later, by mid 2010, Wixom began alleging the DPA was vague, and Bruno advised Smith that the DPA was poorly drafted. (*Smith Dep.*, 98:10-16; *Bruno Dep.*, 78:10-24; *Pl's Resp. Sep State.*, No.17.) As a result, Smith became unhappy with the quality of Cushing's work on the DPA. (*Smith Dep.*, 101:15-24.)

On August 20, 2010, Smith e-mailed Cushing and accused him of drafting a "vague and badly written" DPA, refused to pay Cushing's firm's invoice, and concluded the e-mail by stating:

> I hope you can get to the bottom of why your firm allowed such a poorly written document to be created. I hope whatever you learn can help prevent this from happening *to someone else*.

(*Def.s' Ex. 21*, emphasis added.) Cushing's undisputed testimony is that as a result of this e-mail and Smith's failure to respond to the revised will, Cushing considered himself and Jordan Ramis terminated. (*Cushing Dep.*, 172:12-18, 184:20-185:4.) Consistent with Cushing's belief, Smith admitted that after August 2010, he never received another bill from Jordan Ramis (*Smith Dep.*, 100:18-101:14), and Smith never again discussed the DPA with Cushing (*Id.*, 99:14–20).

Moreover, Smith's filings in the dissolution proceeding indicate that he was only being represented by the Law Offices of Eugene Bruno in that matter. Smith's June 18, 2010 Petition for Dissolution of Domestic Partnership identifies the Law Offices of Eugene C. Bruno, P.C. as Smith's attorney of record. (*Def.s' Ex.* C, p.38.) Neither Cushing nor Jordan Ramis are listed as counsel for Smith. (*See id.*) Over a year later, on July 26, 2011, Smith's discovery responses continue to identify only the Law Offices of Eugene Bruno as Smith's attorney. (*Def.s' Ex. I* [Doc. 24-7], p. 191.) And after the October 2011 trial in the dissolution proceeding, Smith's application for prevailing

party costs again only identifies Bruno's law firm as Smith's counsel. (*Def.s' Ex. 22*, p. 246.) Additionally, Smith's application indicates that none of the $59,068 in attorney's fees and costs that Smith incurred defending Wixom's "motion for declaratory relief and Respondent's subsequent motion for separate trial" was generated by Cushing or his law firm. (*See Ex. 22*, pp. 252–269.) Instead, all claimed fees were generated by Bruno's firm. (*Id.*) All of these undisputed facts contradict Smith's contention that Cushing continued to represent Smith in the dissolution proceeding.

Smith, nevertheless, attempts to create a disputed issue of fact regarding whether Cushing continued to represent him by pointing to (1) the lack of a formal notice of termination by Smith or Cushing, and (2) approximately four telephone calls between Cushing and Smith, and Cushing and Bruno during the dissolution proceeding. The Court is not persuaded.

Smith's reliance on the lack of a formal notice of termination is misplaced for two reasons. First, the absence of a formal notice of termination is not dispositive. See Shapero v. Fliegel, 191 Cal. App. 3d 842, 848 (1987) (failure to formally withdrawal as counsel of record does not toll the limitations period). Rather, as set forth above, the test is whether there exists "evidence of an ongoing *mutual* relationship and of activities in furtherance of the relationship." Worthington, 29 Cal. App. 4th at 1498. The undisputed facts discussed above demonstrate the lack of such a relationship and activities. Second, while Smith contends that the relationship was never formally terminated, there is no dispute that Cushing reasonably interpreted Smith's failure to reply to the revised will in early 2010, and Smith's August 2010 e-mail refusing to pay the firm's billing statement and accusing the firm of malpractice, as a notice of termination. (*Cushing Dep.*, 172:12-18, 184:20-185:4.)

As for Cushing's communications with Smith and Bruno during the dissolution proceeding, they too fail to establish continuous-representation tolling. The record reveals that there was only one telephone conversation between Cushing and Smith, which occurred in March 2011. (*Smith Dep.*, 21:16–22:2, 95:19–96:25; 99:14–20.)

During his deposition, Smith admitted that he contacted Cushing because Bruno wanted to talk to Cushing in preparation for trial. (*Smith Dep.*, 24:9–24; 96:1–4.) Smith, therefore, called and asked Cushing if he would talk to Bruno and provide his notes. (*Id.*) Smith also acknowledged that he did not discuss any "details" with Cushing because he "didn't want to get in between the conversation between Gene and Doug." (*Id.*, 21:23–22:20.) In short, Smith's only communication with Cushing in 2011 was to arrange for Bruno to obtain information from Cushing related to his work on the DPA.[5] Rather than suggesting an ongoing mutual relationship or activity in furtherance of continued representation, the telephone call confirms Cushing was a witness to the preparation of the DPA in 2006.

Cushing's telephone calls with Bruno are likewise insufficient to establish tolling. Bruno alleges talking to Cushing "approximately four" times during the dissolution proceeding. (*Bruno Dep.*, 22:1–4.) However, the fourth phone call occurred after the family court found the DPA invalid, and was to notify Cushing that Smith was sending a legal-malpractice demand letter. (*Id.*, 55:19–56:3.) Thus, this communication is not evidence of continued representation.

Bruno also alleges two telephone calls with Cushing in early April 2011. (*Bruno Dep.*, 33:9–10.) The evidence establishes that these communications were aimed at obtaining information regarding Cushing's preparation of the DPA. (*Bruno Dep.*, 33:9–24.) During his deposition, Bruno described the April call as "an introductory call... to ask about his file and to see if he would cooperate by providing his file." (*Id.*, 33:9–21.) Bruno also acknowledged sending Smith an e-mail about his conversation with Cushing, which stated that because Cushing "did not have a very clear recollection of the chain of events, I will reserve judgment as to whether we will use him at trial until I have an opportunity to look at the file." (*Id.*, 57:8–20.) Similar to Smith's

---

[5] Smith testified that he saw Cushing in approximately August or September of 2011 at a family wedding. (*Smith Dep.*, 47:3-11.) However, Smith acknowledged that they did not discuss any legal matters. (*Id.*, 47:14-15.)

March 2010 telephone call with Cushing, Bruno's April communication with Cushing is not evidence of continued representation, but instead confirms Cushing was a witness.

Bruno contends he talked to Cushing in September 2011. (*Bruno Dep.*, 37:22–38:4.) Because none of the other calls between Cushing and Smith or Bruno even suggest continued representation, Smith's entire tolling argument depends on this alleged phone call.

Bruno insists that during the September 2011 telephone call, the two discussed "strategy." However, Bruno conceded that Cushing "did not have much to add" to the conversation. (*Id.*, 36:24–37:4.) Bruno further admitted that in addition to "discussing strategy," he was also evaluating whether to call Cushing as a witness at the fast-approaching trial. (*Id.*, 58:12-23, 164:2-5.) Bruno's consideration of Cushing as a potential witness during the telephone call is inconsistent with the claim that Cushing was part of Smith's legal team in the dissolution proceeding. Instead, the alleged phone call confirms Cushing's role as a witness. Also inconsistent with the claim that Cushing was now part of Smith's legal team is Smith's admission that he was unaware Bruno contacted Cushing in September 2011, and that Smith was unaware of Cushing "doing anything regarding Mr. Wixom or the DPA" after April 2011. (*Smith Dep.*, 104:7–105:1.) For all these reasons, the alleged September 2011 telephone call does not establish an ongoing mutual relationship between Cushing and Smith, and activities in furtherance of such a relationship.[6]

---

[6] The Court also agrees with Defendants' contention that Cushing's telephone call with Bruno is insufficient under the reasoning in Foxborough, which found that the defendant-attorney's subsequent role as a consultant or expert was "only tangentially related to the legal representation the attorney [previously] provided to the plaintiff." Id., 26 Cal. App. 4th at 229. Cushing's alleged conversation with Bruno regarding strategy is, at best, tangentially related to Cushing's work drafting the DPA.

In summary, the undisputed evidence establishes:

- After being advised by Bruno that the DPA was vague, Smith was unhappy with Cushing's work, accused Cushing's firm of malpractice, and refused to pay the firm's invoice;
- After Smith sent the August 2010 e-mail, Cushing believed the firm was terminated, the firm never sent Smith another invoice, and Cushing never again discussed the DPA with Smith.
- Smith's filings in the dissolution proceeding listed the Law Offices of Eugene Bruno as Smith's attorney, and none of Smith's attorney's fees related to defending Wixom's challenge to the DPA were billed by Cushing or his firm;
- Smith called Cushing in March 2011 to arrange for a conversation with Bruno, and for Cushing to provide his notes to Bruno.
- The April 2011 telephone call between Bruno and Cushing was "introductory," so Bruno could ask Cushing about his file and obtain a copy.
- During the alleged September 2011 telephone call between Bruno and Cushing, Bruno was evaluating whether to use Cushing as a witness at trial, and discussing strategy; however, Cushing "did not have much to add" because of his poor recollection.
- Smith was unaware of Cushing doing anything regarding Wixom or the DPA after April 2011, and Smith was unaware that Bruno talked to Smith in September 2011.

Based on these facts, the Court finds continued-representation tolling does not apply.

**B. <u>Fraud and Negligent Misrepresentation.</u>**

Smith also asserts causes of action for fraud and deceit (3rd), fraudulent concealment (4th), and negligent misrepresentation (5th). These claims are based on the general contention that Cushing misrepresented his ability to prepare the DPA. (*See First Amended Complaint* [Doc. 17], ¶¶ 36, 42, 48; *Smith Dec.* [Doc. 26-6], ¶¶ 4, 5.) Defendants argue these claims should be dismissed because Cushing did not represent that he had particular experience or expertise and Smith did not rely on any alleged misrepresentations. Smith argues that there are disputed issues of material fact regarding both issues. The Court agrees with Cushing.

The evidence establishes that on July 20, 2006, Smith sent Cushing an e-mail explaining that he and Wixom were "in the process of buying a house together in San Diego," and stating that Smith would need a promissory note and to have his will revised. (*Defs.' Ex. 2* [Doc. 24-8].) Smith then mentioned the need to develop the DPA, and asked if Cushing could do the work or recommend someone:

> Also, Chris and I need to develop a Domestic Partner Agreement. We are conceptually in agreement, at this point, but need to work out the details. Can you do that or is there someone else you would recommend?

(*Id.*)

Smith testified that in response to this e-mail, Cushing stated that he could "do that" and that "they had someone in the office licensed in California." (*Smith Dep.*, 30:20–24.) When asked if Cushing elaborated about whether he could handle the DPA, Smith stated, "There wasn't much elaboration. It was a 'Yes, we can take care of this." (*Id.*, 30:25–31:7.)

Cushing's uncontradicted testimony is that he believed he could prepare the DPA because Cushing had experience preparing "prenup type agreement and had done one domestic partnership agreement, had access, you know, to California statutes." (*Cushing Dep.*, 114:7–10.) Cushing also testified that before preparing the DPA, he had prepared another domestic partnership agreement for another client. (*Id.*, 111:22–25.) Cushing also viewed preparation of the DPA as part of the estate-planning work for Smith. (*Id.*, 114:11–23.)

These undisputed facts establish that Cushing did not make any misrepresentations. Smith's deposition and declaration fail to identify any statements by Cushing that were untrue or even half-truths. Indeed, in the approximately five years that Cushing represented Smith before preparing the DPA (*see Smith Dep.*, 23:14–18, admitting Cushing began representing him in 2001), there is no evidence that Cushing ever held himself out as a specialist or an attorney with specialized skill, training or experience. At best, Smith's declaration demonstrates that he made certain assumptions regarding Cushing's skill. (*See Smith Dec.*, ¶¶ 4–5.)

Moreover, the undisputed evidence also establishes that Smith did not rely on any alleged misrepresentations by Cushing. In the underlying dissolution proceeding, Smith described his decision to have Cushing prepare the DPA as follows:

> He was – had been my lawyer, done my will. And on some of the past house-flip projects he also set up an LLC for me so – and Chris knew him as my uncle. So we just – wasn't any more thought than that I guess given to it.
>
> * * *
>
> Oh. And Chris and I negotiated all the terms of the agreement, and we just essentially gave them to him.

(*Smith Underlying Dep.*, 47:13–19, 47: 24–25.) Smith also conceded that before 2011, he never looked into Cushing's qualifications. (*Smith Dep.*, 24:5–8.) This testimony contradicts Smith's claim in his opposition that he relied on alleged misrepresentations by Cushing.

For both of these reasons, the Court will grant summary-adjudication of Smith's misrepresentation claims.

## IV. CONCLUSION & ORDER

For the foregoing reasons, the Court finds the undisputed evidence establishes that (1) Plaintiff Michael L. Smith's legal-malpractice claims were filed after the one-year statute of limitation expired, (2) neither actual-injury tolling nor continued-representation tolling apply, and (3) Defendants Douglas P. Cushing and Jordan Ramis PC did not misrepresent their qualifications and Plaintiff did not rely on any alleged misrepresentations. Accordingly, the Court **GRANTS** Defendants' summary-judgment motion [Doc. 24].

**IT IS SO ORDERED.**

DATED: February 11, 2014

Hon. Thomas J. Whelan
United States District Judge